FILED

2007 Jun-04  AM 11:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT CHAFIN, et al., | ] | |
| | ] | |
| Plaintiffs, | ] | |
| | ] | |
| vs. | ] | 2:05-CV-01726-LSC |
| | ] | |
| WAUSAU UNDERWRITERS | ] | |
| INSURANCE CO., | ] | |
| | ] | |
| Defendant. | ] | |

MEMORANDUM OF OPINION

I.    Introduction.

The Court has for consideration a motion for summary judgment, which was filed by defendant Wausau Underwriters Insurance Company ("Wausau") on November 10, 2006. (Doc. 64.) In their Amended Complaint, Plaintiffs Robert Chafin ("Mr. Chafin") and Robert Randall Chafin, as administrator and personal representative for the Estate of Patricia Chafin ("Mrs. Chafin"), contend that Wausau is liable under Alabama law for outrage, fraud, and breach of contract. (Doc. 44.) The issues raised in Defendant's motion for summary judgment have been briefed by both

parties and are now ripe for decision.  Upon full consideration of the legal

arguments and evidence presented by the parties in this case, Defendant's

motion for summary judgment will be granted in part and denied in part.

II.    Facts.[1]

On August 24, 1978, Robert Chafin, a pedestrian, was struck by a

motor vehicle in the chest and abdomen while acting in the course and

scope of his employment with Brandino Brass.  Mr. Chafin settled his

resulting workers' compensation claim on April 21, 1980.  Under the terms

of the settlement agreement, Wausau Underwriters Insurance Company

agreed to pay for all reasonable and necessary medical treatments arising

from Mr. Chafin's workplace injury.

---

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

In their memoranda, the parties include objections to the admissibility of certain statements or notes.  To the extent the parties argue that evidence is hearsay or otherwise improper, the Court has noted and considered these characterizations.  The materiality, relevancy, and potential admissibility of evidence at trial was carefully weighed by the Court during the summary judgment process.  Immaterial evidence, irrelevant evidence, and other evidence that could not be reduced to admissible form at trial, *see Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999), was rejected by this Court when making its final decision on Defendant's motion for summary judgment.

Because of the accident, Mr. Chafin suffered a spinal cord injury with residual motor deficits, aortic injury, and neurogenic bladder.   In subsequent years, Mr. Chafin developed renal failure requiring dialysis, peripheral neuropathy, and injuries from multiple falls.

Plaintiffs' complaints regarding Wausau's handling of Mr. Chafin's claims and benefits began in 2002.  On November 18, 2002, Mrs. Patricia Chafin called Wausau and reported that her husband had suffered a serious fall resulting in hospitalization.  Dr. Scott Morris treated Mr. Chafin for a trochanter fracture, torn muscles, and severe pain.  As a result of the fall, Mr. Chafin could not get out of bed.  Dr. Morris related the fall to gait problems resulting from Mr. Chafin's workplace injury and recommended nursing home placement.  (Doc. 72, Ex. B at 53.)

Wausau, however, took the position that the recommendation of nursing home placement was based solely on Mr. Chafin's dementia, and denied the request as unrelated to Mr. Chafin's workplace injury.  (Doc. 72, Ex. E at 42.)  As support for its position, Wausau cites only a consultation summary by Dr. Jonathan Mark Westfall, dated November 20, 2002, which assessed Mr. Chafin, then seventy-two years old, as having "some signs of

early stage dementia" and "probable Alzheimer's disease." (Doc. 72, Ex. D.)  The assessment also noted that Mr. Chafin had no past psychiatric history, no family history of mental illness, he was "pleasant, noncombative, cooperative," but he had "some forgetfulness." (*Id*.)  It is not evident from the record that there was ever any psychiatric follow-up conducted regarding this assessment.

On March 15, 2004, Mr. Chafin was admitted for profound weakness, nausea, and vomiting.  Dr. Vijay Caplash, a nephrologist, diagnosed Mr. Chafin with progressive renal insufficiency, ordered dialysis, and related Mr. Chafin's condition to his workplace injury. (*Id*. at 52.)  Mr. Chafin required dialysis three times a week, and Viva Insurance—not Wausau—paid for the treatments while Wausau says it investigated whether it would take responsibility for the dialysis.  A note created on April 2, 2004, indicates that Wausau was notified of Mr. Chafin's need for dialysis.  A field investigator did not talk with the Chafins and ask for medical reports until July 24, 2004. (*Id*. at 60.)  Wausau now admits that it is responsible for Mr. Chafin's dialysis, and maintains that it accepted responsibility in September 2004.  Plaintiffs, however, have provided the Court with a letter dated May

24, 2006, which reflects a continued attempt to seek payment for Mr. Chafin's dialysis.  (Doc. 72, Ex. H.)

Plaintiffs maintain that soon after Mr. Chafin was diagnosed with end-stage renal failure, he became unable to care for himself physically.  Mr. Chafin could no longer get out of bed on his own, could not bathe himself, could not control his bowel movements, could not change his own diaper, and could not transport himself to his tri-weekly dialysis sessions.  Mrs. Chafin, a seventy-three year old woman battling lung cancer, could not physically lift her husband.  Plaintiffs claim that Mr. Chafin often sat in his own feces for extended periods of time, the family's furniture was ruined, and the bathroom walls would become smeared as he struggled to use the bathroom.  The home became so filthy that the Chafins could no longer have their grandchildren visit or host family holidays.  At one point, Mr. Chafin's son Richard quit his job to help take care of his parents, but he was unable to do so effectively.  The Chafins, therefore, asked Wausau to pay for nursing care for Mr. Chafin.

On October 7, 2004, Dr. Caplash wrote a letter detailing Mr. Chafin's

medical problems and Mrs. Chafin's difficulties in assisting her husband with

his care.  Dr. Caplash's letter stated:

> Mr. Robert Chafin is a patient of mine with end-stage
> renal disease, on hemodialysis three times a week at
> Gambro Dialysis East.   He has multiple other
> problems like neurogenic bladder, peripheral
> neuropathy with difficulty in walking, and
> hyperlipidemia.   His wife tells me that he has
> difficulty in ambulating and difficulty in self-
> catheterization and sometimes loses the bowel
> control and according to her is very hard for her to
> take care of him and she needs some help.  I feel
> that he does deserve some help because of these
> multiple medical problems.  Any further details you
> can call me. [sic]

(*Id*. at Pl. Ex. 3.)  On December 20, 2004, Dr. Steven J. Kulback, another

treating physician, wrote:

> Mr. Chafin is now in the need of home care medical
> services due to inability of former caregivers to
> attend to his needs, and the general worsening of his
> condition.   His debility is directly related to his
> kidney failure, which in turn is related to his
> neurogenic bladder, which in turn was a result of his
> aortic injury from the work-related motor vehicle
> accident in 1978.  I was not his doctor at the time of
> the original injury, but the chain of events makes
> sense to me.

(*Id.* at Pl. Ex. 4.)

Wausau, however, denied the Chafins' claim for nursing care on January 12, 2005.  Wausau has not provided for either nursing home care or home care assistance.   A Wausau representative testified that the physicians' letters did not say that Mr. Chafin needed nursing care because of their injury.  (Doc. 72, Ex. E at 125.)  Although Wausau admits that it is responsible for Mr. Chafin's neurogenic bladder, peripheral neuropathy, hyperlipidemia, end-stage renal disease, and hemodialysis, Wausau concluded that the request for nursing home care was "due to dementia and that the dementia was not related to his work injury."  (*Id.* at 127-130, 133, 179.)  Again, as support for its decision, Wausau cites the consultation summary by Dr. Jonathan Mark Westfall, dated November 20, 2002.  (*Id.* at 133-34.)  Wausau's representative also interpreted Dr. Caplash's letter as a request for help for Mrs. Chafin—not Mr. Chafin.  (*Id.* at 128.)

Notably, immediately prior to Wausau's denial, Sharon Bertler wrote the following  in the claim file on January 11, 2005:

> I reiterated the need to involve LMRMD to review the clmt's medical history which I understand does include a 2002 diagnosis of Alzheimer's disease,

binge drinking, as well as renal disease necessitating 3 times weekly dialysis.   To date much of the documentation of these issues is based on hearsay information provided by numbers of individuals, w/ much of it being inaccurate (clmt in need of placement for hospice because he is dying).   We need to obtain medical records from the hospital discharging him as well as personal medical records in order to base a causation determination on objective findings rather than information provided by family or by other individuals that may be less than objective.

(Doc. 72, Ex. B at 19.)

The day after the denial, on January 13, 2005, Dr. Terri S. Steele,[2]

Assistant Professor of Psychiatry & Behavioral Neurobiology, wrote:

Mr. Robert Chafin has been a patient on my service 12/23/04 to the present.   Because of his multiple medical requirements it is my recommendation that he be placed in a highly structured environment or an assisted living facility that provides his level of care (i.e., The Park at Riverchase, level III).

On February 2, 2005, Ms. Bertler noted in the claim file:

Ascribing causation of his [Mr. Chafin's] deterioration exceeds our scope of practice. . . . If we have a physician's opinion that his increasing deterioration

---

[2]Wausau contends that Dr. Steele is not a "treating physician" under Alabama Code § 25-5-7, but this issue is not material to the Court's decision on Wausau's motion for summary judgment.

> & need for home care is related to his compensable
> injury & in home assistance is prescribed by his
> physician then we are obligated to provide what ever
> [sic] care is reasonable & medically necessary.

(*Id.* at 17.)

Wausau did not arrange for a physician's review of Mr. Chafin's medical records until after its denial of the Chafins' claim.  The reviewing physician did not examine Mr. Chafin; instead, he decided that there was "insufficient information" in the file to conclude that Mr. Chafin's weakness was causally related to the claim, and a "non-work related condition [dementia] is what aggravated [Mr. Chafin's] work related neurogenic bladder.  If [Mr. Chafin's] mental status was good [and he] self-cared for himself, this would not have been an issue."  (*Id.* at 16.)  Again, the only doctor-provided information Wausau had at the time with regard to Mr. Chafin's dementia was the November 2002 consultation summary that concluded Mr. Chafin had "some signs of early stage dementia."

III.    Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.    Analysis.

   A.    Breach of Contract.

   In Count IV of their Amended Complaint, Plaintiffs assert that Wausau is liable for breach of contract because it has refused to pay expenses required under Mr. Chafin's workers' compensation settlement agreement ("the Agreement").   Wausau contends that it is entitled to summary judgment with regard to Mrs. Chafin's portion of the breach of contract claim because Mrs. Chafin was not a party to the Agreement, nor is there any evidence that she was an intended beneficiary of the Agreement.  (Doc. 65 at 17-18.)   Because Plaintiffs have not submitted any argument or evidence in opposition to Defendant's motion on this claim, Mrs. Chafin's breach of contract claim will be dismissed.   "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed

abandoned." *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

Wausau's memorandum in support of summary judgment, however, does not argue for dismissal of Mr. Chafin's breach of contract claim.  (Doc. 65 at 17-18.)  Because Wausau has not met its burden to inform the Court of the basis for its motion, and identify those portions of the evidence it believes demonstrate the absence of a genuine issue of material fact with regard to Mr. Chafin's allegation of breach of contract, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), that claim remains.

B.    Fraud.

Counts II and III of Plaintiffs' Amended Complaint allege that Wausau committed fraud with regard to the investigation and payment of Mr. Chafin's medical expenses under the Agreement.  Plaintiffs maintain that "Wausau falsely represented that it would provide nursing home benefits if Mr. Chafin's treating physicians related Mr. Chafin's need for nursing care to his workplace accident."  (Doc. 71 at 28.)  They also argue that "Wausau suppressed the material fact that no matter what the Chafins did and no matter what the Chafin's [sic] doctors said, Wausau was not going to pay for

nursing care[, and] that even though it expressly acknowledged responsibility for Mr. Chafin's dialysis, it had no intention of paying for the dialysis unless forced to do so." (*Id.* at 29.)  Wausau argues that Plaintiffs' assertions of fraud amount to nothing more than claims for bad faith refusal to pay benefits, which are barred by the exclusivity provisions of the Alabama Workers' Compensation Act.   In the alternative, Defendant contends that Plaintiffs have not met the "extremely high" evidentiary burden set forth by Alabama courts for the few situations in which fraud claims are allowed and not barred by the exclusivity provisions.  (Doc. 65 at 13-17.)

      "Alabama law defines legal fraud as follows: 'Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.'" *Montgomery Rubber & Gasket Co., Inc. v. Belmont Machinery Co., Inc.*, 308 F. Supp. 2d 1293, 1297 (M.D. Ala. 2004) (quoting 1975 Ala. Code § 6-5-101).   "The elements of a fraudulent misrepresentation claim are: (1) a false representation, (2) of a material fact, (3), that is reasonably relied upon,

and (4) damage that is proximately caused by the representation. *Id.* (citing *Epps Aircraft, Inc. v. Exxon Corp.,* 859 F. Supp. 533, 537 (M.D. Ala.1993) (Thompson, J.), *aff'd,* 30 F.3d 1499 (11th Cir. 1994) (table); *Foremost Ins. Co. v. Parham,* 693 So. 2d 409, 421 (Ala. 1997)).   However, because the fraudulent misrepresentation alleged in this case involves "a promise to perform future acts, Plaintiff[s] must also establish that Defendant had a present intent to deceive at the time that the alleged promise was made." *Wiggins v. Risk Enter. Mgmt.,* 14 F. Supp. 2d 1279, 1288 (M.D. Ala. 1998) (citing *First Bank of Boaz v. Fielder,* 590 So. 2d 893, 897 (Ala. 1991), *overruled on other grounds, Life Ins. Co. v. Green,* 719 So. 2d 797 (Ala. 1998)).

A claim for fraudulent suppression requires proof of: "1) the suppression of a material fact 2) that the defendant was under a duty to communicate 3) either because of a confidential relation between the plaintiff and the defendant or because of the particular circumstances of the case." *Crowder v. Mem'l Hill Gardens, Inc.*, 516 So. 2d 602, 604 (Ala. 1987) (citing 1975 Ala. Code § 6-5-102).   This claim, too, requires active concealment or misrepresentation. *Id.* at 604-05.

Plaintiffs' burden with regard to these types of fraud claims is made even more difficult by the Alabama Supreme Court's holding that they "must present evidence that, if accepted and believed by the jury, would qualify as clear and convincing proof of fraud." *Lowman v. Piedmont Executive Shirt Mfg. Co.*, 547 So. 2d 90, 95 (Ala. 1989); *see also ITT Specialty Risk Servs., Inc.*, 842 So. 2d 638, 647 (Ala. 2002); *Hobbs v. Ala. Power Co.*, 775 So. 2d 783, 787 (Ala. 2000).  Despite this high burden, Plaintiffs' legal argument regarding their fraud claims does not cite to any evidence in the record.  (Doc. 71 at 27-30.)  Moreover, a review of the evidence provided to the Court confirms that Plaintiffs cannot meet their burden.  Plaintiffs have not proffered any evidence, let alone "clear and convincing evidence," that Wausau acted with a present intent to deceive at the time it allegedly informed the Chafins that nursing benefits would be paid if treating physicians related Mr. Chafin's need for nursing care to his workplace accident.  There is also no evidence of active concealment or suppression of any alleged conviction on Wausau's part that it would not pay for nursing care or dialysis.  In fact, Plaintiffs do not even argue that Wausau acted with a present intent to deceive or engaged in active concealment.  (*Id.*)

The Court agrees with the defendant that Plaintiffs' fraud claims are, in substance, bad faith failure to pay claims, which are barred by the exclusivity provisions of the Alabama Workers' Compensation Act.  *See Hobbs*, 775 So. 2d at 787.  Therefore, summary judgment will be granted with regard to Counts II and III of Plaintiffs' Amended Complaint.

C.    Outrage.

Finally, Plaintiffs allege that Wausau is liable for outrage, or intentional/reckless infliction of emotional distress, for the mishandling and denial of numerous claims for treatment for Mr. Chafin without "any legitimate, arguable, or debatable reason," and with knowledge that those denials would result in severe emotional distress.  (Doc. 44 ¶ 17.)  Wausau contends that it is entitled to summary judgment because Plaintiffs' claims do not meet the minimum threshold set forth for such claims in the Alabama Supreme Court cases of *Continental Casualty Insurance Co. v. McDonald*, 567 So. 2d 1208 (Ala. 1990), or *Travelers Indemnity Co. of Illinois v. Griner*, 809 So. 2d 808 (Ala. 2001).  Specifically, Defendant argues that the "threshold amounts to a continuing pattern of denial of authorized treating physician-ordered medical benefits without good cause and a use of [the defendant's]

position of denial to coerce the Plaintiff into settling his right to future medical benefits for a sum not commensurate with its own assessment of future needs." (Doc. 65 at 11.)  Wausau also maintains that there is no evidence that its action/inaction "was intended to cause severe emotional distress." (*Id*. at 12.)

The Alabama Supreme Court has held that "the tort of outrageous conduct can exist in a workmen's compensation setting." *Farley v. CNA Ins. Co.*, 576 So. 2d 158, 159 (Ala. 1991).  In order to prevail on a claim for outrage, a plaintiff must show: "(1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Jenkins v. U.S. Fidelity & Guaranty Co.*, 698 So. 2d 765, 768  (Ala. 1997) (citing *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)).  "Extreme" has been defined as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id*. (quoting *Inmon*, 394 So. 2d at 365 (citations omitted)).  Alabama law requires plaintiffs to meet their burden by

submitting substantial evidence in support of their allegations of outrageous conduct.  *Farley*, 576 So. 2d at 160.

Although Wausau contends that there is no evidence it "intended" to cause severe emotional distress, a plaintiff must only show reckless conduct on the part of the defendant in order to establish a claim for outrage. Plaintiffs have introduced substantial evidence that agents and employees of Wausau "knew or should have known that emotional distress [would] likely result" from their denials and or delays in handling Mr. Chafin's claims for treatment.  *See, e.g., Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 282 (Ala. 2000).  Wausau had knowledge of Mr. Chafin's serious medical conditions, that his symptoms were getting worse, and that he could no longer care for himself.  Wausau also knew that Mrs. Chafin had cancer, she called the company crying for help, and she had talked about selling her home to cover her husband's care.  It is especially clear from Wausau's records and its agents' deposition testimony that the company was aware that the Chafins would likely suffer emotional distress due to their denial of nursing care.  Moreover, Wausau does not contest Plaintiffs' assertions that its denial of nursing care to Mr. Chafin did, in fact, cause the

Chafins severe emotional distress.  And, the Court finds that the plaintiffs have proffered sufficient evidence to create a genuine question of fact for the jury on that issue.

Nonetheless, "there is clearly a threshold beyond which an insurance company's recalcitrance must go before it crosses into outrageous conduct." *Farley*, 576 So. 2d at 160.  The Alabama Supreme Court has held that the facts of the plaintiff's case in *Continental Casualty Insurance Co. v. McDonald*, 567 So. 2d 1208 (Ala. 1990), represent this "minimum threshold." *McAfee v. Shredders, Inc.*, 650 So. 2d 871, 873 (Ala. 1994).  In *McDonald*, the plaintiff sued his workers' compensation carrier following repeated delays in requests for treatment for his chronic and disabling back pain.  The delays resulted in pharmacies refusing to fill prescriptions due to nonpayment, and the "final straw" came when the carrier refused to provide the plaintiff with a hot tub that had been prescribed for pain relief.  The court found that there was sufficient evidence to present a jury question as to whether the defendant's conduct was extreme and outrageous because: (1) the defendant "had no legal right to delay payments for no good reason, and the jury could have found that, on

occasions when [the defendant] did assert its legal rights [and question the reasonable necessity of the expenses], it did not do so in a permissible way"; (2) the plaintiff's "need for treatment for his pain was an immediate, day-to-day need . . . [and the defendant] engaged in repeated conduct that brought the availability of treatment into doubt"; (3) the defendant's "dilatory handling of [the plaintiff's] claims encompassed a whole spectrum of different claims over a period of five years or more"; (4) and the plaintiff "produced evidence from [the defendant's] own records and communications that its goal in dealing with him was to persuade him, or, as the jury may have found, to coerce him, to settle for a lump-sum benefit."  *McDonald*, 567 So. 2d at 1220.

Thereafter, in *Travelers Indemnity Co. of Illinois v. Griner*, 809 So. 2d 808 (Ala. 2001), the Alabama Supreme Court held that a plaintiff met the threshold established in *McDonald*.  In *Griner*, evidence showed that those who admitted they "had the legal obligation to pay for and provide all reasonable and necessary medical services" related to the plaintiff's workers' compensation injury refused to pay for a prescribed hospital bed, whirlpool tub, and psychiatric treatment, "although they had no information

indicating that they were not reasonable and necessary." 809 So. 2d at 811. The Court also noted that the items "were not provided for a period of approximately five years," and despite an estimate that one of the defendants could expect to pay $279,400 for care over the period of the plaintiff's lifetime, that defendant only offered $5,000 to settle the claim. *Id.* at 811-12.

In contrast, evidence that a workers' compensation carrier denied a plaintiff rehabilitation based on a vocational expert's report made prior to settlement that stated the plaintiff "had scored in the 'low range' in vocational testing and had lost access to 68% of the jobs that he had been able to perform before his injury," was "insufficient to meet the *Inmon* standard" regarding outrageous conduct. *McAfee v. Shredders, Inc.*, 650 So. 2d 871, 873 (Ala. 1994).   Having an "unsympathetic attitude" toward a plaintiff with reflex sympathetic dystrophy in her hand, giving her "the runaround" with regard to her medical bills, and sending her to various doctors was also not sufficiently egregious for a claim of outrage. *Farley v. CNA Ins. Co.*, 576 So. 2d 158 (Ala. 1991).  And, the Alabama Supreme Court made it clear in *ITT Specialty Risk Servs., Inc. v. Barr*, 842 So. 2d 638 (Ala.

2002), that a plaintiff cannot succeed on a claim for intentional/reckless infliction of emotional distress with mere evidence that the defendant unreasonably denied the plaintiff's claim.  *Id.* at 644-45.

In this case, Plaintiffs have proffered substantial evidence from which a jury could infer that Wausau has unreasonably denied and/or failed to timely pay for treatments for which they are responsible under the terms of the workers' compensation settlement agreement.  The arguably most egregious conduct alleged is Wausau's repeated denial of the Chafins' request for nursing care.  As early as November 2002, Wausau received a request for nursing home placement for Mr. Chafin by his physician.  (Doc. 72, Ex. B at 53.)  The physician informed Wausau that Mr. Chafin was immobile due to an acute fall, his fall was related to his gait problems, and his gait problems were secondary to the spinal cord injury suffered during his employment.  (*Id.*)  In a note the previous day, a Wausau employee writes that, with regard to Mr. Chafin's neurogenic bladder, unsteady gait, renal failure, and a burn suffered during a fall, "MDs agreed all these problems were secondary to his old spinal cord injury."  (*Id.* at 53-54.) Wausau, however, chose to deny nursing home placement based on a

subsequent consultative examination that assessed Mr. Chafin, then seventy-two years old, as having "some forgetfulness."  (Doc. 72, Ex. D.)  The "forgetfulness" was identified as a "sign" of "early dementia," and the doctor hypothesized that Mr. Chafin had "probable Alzheimer's disease" (*id*.); however, the Court has not been presented with any evidence that there was a follow-up examination or actual diagnosis of either dementia or Alzheimer's.  Viewed in the light most favorable to the plaintiffs, the evidence shows that Wausau seized on this examination and denied the request for nursing home care as based solely on Mr. Chafin's dementia and unrelated to his workplace injury.  (Doc. 72, Ex. E at 42.)

Later, in October and December 2004, when two doctors wrote letters recommending in-home medical assistance, Wausau refused to provide either nursing home care or in-home assistance.[3]  Although both doctors listed physical problems for which Wausau has admitted it is responsible as the reason(s) for their recommendations, Wausau again denied Mr. Chafin's claim based on the 2002 assessment that he had "some forgetfulness."

---

[3]The record shows that the Chafins asked for either nursing home care or in-home medical assistance.  (*See, e.g.,* Doc. 72, Ex. B at 43, 46.)

(Doc. 72, Ex. E at 127-34.)   That denial occurred only one day after a Wausau representative noted that the company needed to obtain actual medical records to make their decision because "[t]o date much of the documentation of these issues is based on hearsay information provided by numbers of individuals, [with] much of it being inaccurate." (Doc. 72, Ex. E at 19.) However, Wausau did not arrange for an actual physician's review of Mr. Chafin's medical records until after its denial.  Then, the evidence in the record shows that Wausau concentrated on finding support for its decision that "dementia" was the reason Mr. Chafin needed nursing care. The reviewing (but non-examining) physician concluded that Mr. Chafin's dementia "aggravated [his] work related neurogenic bladder," resulting in "the renal failure possibly developing." (Doc. 72, Ex. B at 16.)  Therefore, dementia—not the work-related injury—made the nursing care necessary. (*Id.*) Yet, Wausau had confirmed responsibility for the renal failure. (*Id.* at 45.)   Plaintiffs have provided sufficient evidence that could lead a reasonable jury to conclude that Wausau should have extended that responsibility to nursing care as well.

Plaintiffs have also proffered evidence of other issues with nonpayment or delays related to claims for wheelchairs and dialysis that create a genuine issue as to whether Wausau fulfilled its responsibilities with respect to those requests. (*See, e.g.*, Doc. 72, Ex. B at 19, 45, 51; Ex. H.) Plaintiffs' disputes with Wausau prior to suit encompass a time period of over two years, and this litigation has been pending for nearly two years. It is also undisputed that, much like the plaintiff in *McDonald*, Mr. Chafin's need for treatment was a daily (i.e., nursing care, wheelchairs) or tri-weekly (i.e., dialysis) requirement. And, it seems important to note, given the circumstances of this case, that the primary treatments at issue involved Mr. Chafin's immobility and inabilities to perform essential life functions.

Wausau strenuously argues that it is entitled to summary judgment because there is no evidence of improper settlement offers and/or negotiations in this case. Defendant contends that "the law requires the actions of insurance representatives, however egregious, must be shrouded in a concerted effort to coerce the plaintiff to settle his claim for an unfairly low lump sum payment." (Doc. 75 at 8.) Although there was no offer of a lump sum payment in this case, Defendant's actions may be

viewed as an attempt to coerce the Chafins to settle for the level of compensation Wausau was then providing and silence any future demands for increased long-term care.

Moreover, while the cases upholding outrage claims thus far in the state of Alabama have involved actions involving misconduct in settlement negotiations, Plaintiffs may also present evidence of "an arguably improper motive."  *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1220 (Ala. 1990); *see also McAfee v. Shredders, Inc.*, 650 So. 2d 871, 873 (Ala. 1994). There is evidence in the record that Wausau had been informed that Mr. Chafin could only expect to live "another year or two."  (Doc. 72, Ex. B at 44.)  And, Wausau considered it important, in the context of its discussion on whether it had information confirming its denial of benefits, to note that it needed Mr. Chafin's physician to document his life expectancy projection. (*Id.* at 43.)  A subsequent note in Wausau's file states that the company could expect to save $240,000 due to the denial of 24-hour care based on the estimated life expectancy of two years.  (Doc. 72, Ex. B at 36; Ex. E at 168.)  There is also evidence that Wausau, at the time of the denial, was aware that Mrs. Chafin, an elderly woman, had cancer.  (Doc. 72, Ex. B at

47; Ex. E at 118.)  Viewing these facts in the light most favorable to the plaintiffs, in combination with evidence that Wausau continued to search for support for a decision it had already made, arguably without documented evidence in its favor, a jury could very well find that Wausau denied the Chafins' claims based on economic savings—and with the knowledge or belief that neither of the Chafins would likely live long enough to successfully contest that decision.  Such a motive is just as improper as any attempt to force settlement.

At a minimum, Plaintiffs have gone well beyond allegations that the Wausau's denials or delays with regard to Mr. Chafin's claim for treatment were unreasonable.  *See ITT Specialty Risk Servs., Inc. v. Barr*, 842 So. 2d 638, 645 (Ala. 2002).  They have succeeded in providing the Court with sufficient evidence that a reasonable jury could very well find that Wausau engaged in "extreme and outrageous" conduct.

Therefore, in accordance with the rationale outlined above, the Court will deny Wausau's motion for summary judgment on Plaintiffs'[4] claims of outrage.

V.    Conclusion.

For the reasons stated above, Defendant's motion for summary judgment will be granted in part and denied in part.  A separate order will be entered.

Done this 4th day of June 2007.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153

_____

[4]Wausau has argued that Mrs. Chafin's claim of outrage fails as a matter of law because there is no Alabama case law recognizing such a claim on the part of a spouse of an injured worker.  (Doc. 65 at 13.)  Wausau does not, however, cite any legal authority saying that such a claim cannot exist.  In fact, in *Nabors v. Travelers Ins. Co.*, 551 So. 2d 308 (Ala. 1989), the court addressed an outrage claim by an employee and her spouse against a workers' compensation insurance carrier.  The court ultimately found that there was no evidence of outrageous conduct, but there is no hint that the spouse could not pursue his own claim.

Furthermore, Plaintiffs correctly indicate that Alabama courts have allowed individuals in other circumstances to pursue outrage claims for conduct directed at their loved ones.  *See, e.g.*, *Akins Funeral Home, Inc. v. Miller*, 878 So. 2d 267 (Ala. 2003).  There is sufficient evidence in this case that Mrs. Chafin was heavily involved in communications with Wausau regarding her husband's claims for treatment, she lived with her husband, she observed his hardships every day, and she cared for Mr. Chafin when she was physically able.  Wausau was aware of Mrs. Chafin's involvement and knew or should have known that the conduct at issue in this case would result in emotional distress on her part.  Therefore, a jury may hear Mrs. Chafin's claim.